UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 1:13-CV-24048-HUCK/OTAZO-REYES

HUMBERTO VALDES,

    Valdes,

vs.

CITY OF DORAL, YVONNE
SOLER-MCKINLEY, individually, and
RICARDO GOMEZ, individually,

    Defendants.
_____/

**Plaintiff's Response to Defendant's Motion for Summary Judgment**

    Plaintiff, Humberto Valdes, hereby responds to Defendant, City of Doral's, Motion for Summary Judgment ("Motion") [DE 86].

**SUMMARY OF ARGUMENT**

    Valdes agrees that summary judgment is proper on his Title VII and Florida Civil Rights Act (FCRA) retaliation claims (Counts I and II of his Amended complaint for Damages and Other Relief - Jury Trial Demanded) (hereafter "Amended Complaint"). However, summary judgment should be denied on Valdes's disability-related claims because Valdes can show that he is a qualified individual with a disability protected by the ADA and the FCRA; particularly, a disputed issue of material fact exists as to what *are* the essential requirements of a police lieutenant's job and whether Valdes could perform them with or without a reasonable accommodation.[1]  Finally, summary

---

[1] Valdes pleads disability claims under the Americans with Disabilities Act (ADA), as amended, and the Florida Civil Rights Act (FCRA) in Count III (ADA) and Count IV (FCRA).  He has titled his claims under both statutes "failure to accommodate" claims. See Amended Complaint, pp. 28, 29.  However, the facts alleged to support this claim, see ¶¶ 1-12, 14, 15-19, 21, 22, 24, 26-28, 31, 32, 34-51, 53-70, 73-76, 80-82, 89 and 90, also would support a disability discrimination
(continued...)



**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

judgment is improper on Valdes' First Amendment claim because Valdes's engaged in constitutionally protected speech; and record evidence exists from which a reasonable jury could infer that Valdes' protected speech was a "substantial or motivating factor" in the adverse actions of which he complains.

## THE APPLICABLE STANDARDS

<u>For granting summary judgment</u>

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of meeting this exacting standard, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>United States v. Four Parcels of Real Prop.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting <u>Celotex</u>, 477 U.S. at 323).

In assessing whether the moving party has satisfied its burden, the court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. <u>Batey v. Stone</u>, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1 (1st Cir. 1997). If the record presents factual issues, the court must deny the motion and proceed to trial. <u>Adickes</u>, 398 U.S. at 157; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

<u>For determining whether a litigant is a "qualified individual with a disability" under the ADA and FCRA</u>[2]

---

[1](...continued)
claim under the "regarded as" prong of the ADA and FCRA. Plaintiff need not address the substance of a claim in this response under either theory, however, because defendant has put all of its summary judgment eggs in the he's-not-qualified basket.

[2]Disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims. <u>Samson v. Fed. Express Corp.</u>, 746 F.3d 1196, 1200 (11th Cir. Fla. 2014), citing <u>Holly v. Clairson Indus., LLC</u>, 492 F.3d 1247, 1255 (11th Cir. 2007).

Under the ADA, no employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of disability discrimination, a plaintiff must show that he (1) is disabled, (2) is a "qualified" individual, and (3) was subjected to unlawful discrimination because of his disability. Samson v. Fed. Express Corp., 746 F.3d 1196, 1200 (11th Cir. Fla. 2014) (citation omitted).

> "A 'qualified individual' is someone 'who, *with or without* reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires.' 42 U.S.C. § 12111(8) (emphasis added). 'Essential functions' are 'the fundamental job duties of the employment position,' but do 'not include the marginal functions of the position.' 29 C.F.R. § 1630.2(n)(1)."

Samson, 746 F.3d at 1200.

### What functions are "essential"?

"Whether a particular job function is essential is evaluated on a case-by-case basis by examining a number of factors" and requires a "a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." Samson, 746 F.3d at 1200-1201 (internal citations and quotation marks omitted.) Relevant factors include "[t]he employer's judgment as to which functions are essential," 29 C.F.R. § 1630.2(n)(3)(I), which is "entitled to substantial weight" but is not conclusive. Samson, 746 F.3d at 1201, citing Holly v. Clairson Industries, LLC, 492 F.3d 1247, 1258 (11th Cir. 2007). Were the employer's judgment conclusive,

> then an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is "essential," avoid the clear congressional mandate that employers "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

Id. (citing 42 U.S.C. § 12112(b)(5)(A)) (alteration in original).

Other factors the EEOC's ADA implementing regulations identify to determine which functions are "essential" include: (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs. D'Angelo v. Conagra Foods, 422 F.3d 1220,

1230 (11th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)). The EEOC regulations also identify three nonexclusive bases on which a job function may be deemed essential: (1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function." D'Angelo, 422 F.3d at 1230 (quotation marks omitted) (citing § 1630.2(n)(2)).

As noted in Samson, quoting approvingly from Keith v. Cnty. of Oakland, 703 F.3d 918, 926 (6th Cir. 2013), "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." See also Shelton v. Price Waterhouse Coopers, LLP, 2014 U.S. Dist. LEXIS 61359 (M.D. Fla. May 2, 2014) (whether a job function is essential is a question of fact)(denying summary judgment on claim that regular, on-site attendance was essential to the position); see also Russell v. City of New York, 2006 U.S. Dist. LEXIS 55876, 7 (E.D.N.Y. Aug. 1, 2006)(whether carrying a firearm was an essential function of the job of a police lieutenant who suffered from paranoid schizophrenia that was controlled by medication allowing him to return to an administrative position presented factual issue that could not be decided on motion for judgment on the pleadings)(Rehabilitation Act case)[3].

**Is the plaintiff otherwise qualified?**

If a task is considered an "essential function" of the job, the court takes a two step approach to determine if the individual is "otherwise qualified" under the ADA. See First, the court determines whether the individual is capable of performing the essential functions of the job in question. See Jackson v. Veterans Admin., 22 F.3d 277, 281 (11th Cir. 1994)("First, the court determines whether the individual is capable of performing the essential functions of the job in question.... If so, then he is otherwise qualified. If not, the court must determine whether any reasonable accommodation by the employer would enable him to perform those functions.")(interior citations and quotation marks omitted)(Rehabilitation Act case). "The key to determining the reasonableness of an accommodation at the summary judgment stage is whether such accommodation would *necessarily* eliminate an essential function of the job." Id. at 283.

---

[3]Cash v. Smith, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.").

4

Cases involving police lieutenants and those dealing with shift assignments indicate that the highly factual inquiry required is seldom amenable to summary disposition.[4] See, e.g., Destefano v. City of Phila., 2013 U.S. Dist. LEXIS 143109, 18-19 (E.D. Pa. Oct. 3, 2013)(denying summary judgment in Rehabilitation Act case involving police lieutenant because factual disputes existed whether "patrol" was an essential element of the job and whether plaintiff had the ability to "patrol" despite knee injury); Kuntz v. City of New Haven, 1993 U.S. Dist. LEXIS 20088, *50, 53 (D. Conn. 1993)(police promotion case decided under Rehabilitation Act entering judgment for sergeant whom City failed to promote to lieutenant because of heart condition finding that "the 'essential functions' of the position of lieutenant in the NHPD are overwhelmingly, if not exclusively, supervisory in nature" and that the functions about which questions existed as to his ability to perform—"such as chasing and tackling a suspect in a dark alley at 3:00 a.m., engaging in high speed chases, holding back an unruly crowd, coming face-to-face with an armed individual, or rescuing a fellow officer or private citizen"—were statistically unlikely); Gonzalez v. Ill. State Toll Highway Auth., 2010 U.S. Dist. LEXIS 96777, 15 (N.D. Ill. Sept. 14, 2010)(denying summary judgment against toll collector, whose job description required "the ability to work seven (7) days [a] week, twenty-fours hours a day, including night[s], weekends, and holidays" and who sought morning shifts because he took medication late in the day that made him groggy).

For establishing a First Amendment claim

---

[4]In Holbrook v. City of Alpharetta, 112 F.3d 1522, 1528 (11th Cir. 1997), quoted by defendant for the proposition that "being prepared to respond to unexpected events is, in part, precisely what defines a police officer or detective," does not require a different conclusion. The court noted, "We do not imply that an employer invariably is absolved from having to make reasonable accommodations for a disabled employee whenever a given job involves any measure of unpredictability, nor do we suggest that police departments in general cannot be held strictly to the standards set forth in the ADA."

As for Bogner v. Wackenhut Corp., 2008 Dist. LEXIS 1063, *16 (W.D.N.Y Jan 7, 2008), a pre-Americans with Disabilities Act Amendments Act case, summary judgment was granted on the basis that plaintiff's epilepsy did not rise to the level of a disability. The discussion about whether the plaintiff was a qualified individual was dicta; moreover, the plaintiff there was unable perform several tasks the court found "essential" to his job and the accommodation the plaintiff suggested was not reasonable. Id. at *15-17.

As recently stated in Brannon v. Finkelstein, 754 F.3d 1269, 1274 (11th Cir. 2014), quoting Castle v. Appalachian Technical Coll., 631 F.3d 1194, 1197 (11th Cir. 2011):

> "To establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech."

754 F.3d at 1274.

### Protected speech

Whether a public employee's speech is protected depends on, *First*, about what he is speaking, and, *Second*, whether he is doing so as an employee or as a citizen.

The Supreme Court recognized in Garcetti v. Ceballos, 547 U.S. 410 (2006) that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations," id. at 418, holding that a deputy district attorney's disagreement with (and testimony against) the issuance of a search warrant was part of his job, and not deserving of first-amendment protection. Therefore, notwithstanding that "[t]he First Amendment protects some expressions related to the speaker's job," id. at 421, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. This is because "[t]his prospect of protection ... does not invest them with a right to perform their jobs however they see fit." Id. at 422.

Government employers are not free under Garcetti, however, to "restrict employees' rights by creating excessively broad job descriptions," id. at 424, "and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 425.

Consistent with the Garcetti court's observation that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," id., the Court in Lane v. Franks, 134 S. Ct. 2369 (2014), overruled an unpublished Eleventh Circuit opinion, Lane v. Central Ala. Community College, 523 Fed. Appx. 709 (11th Cir. 2013) characterizing as unprotected a youth-program director's testimony against a state legislator who never showed up for a job for which she was paid with government funds.

6

The Eleventh Circuit panel's decision relied upon Abdur-Rahman v. Walker, 567 F. 3d 1278, 1283 (11th Cir. 2009), in which the speech at issue were "reports by compliance inspectors of a water-and-sewer department ... based on investigations of sewer overflows the inspectors performed as part of their assigned duties." 567 F.3d 1279. Although the two inspectors articulated concerns that "that sewer overflows 'were not being properly reported' to state authorities and were not cordoned off or bioremediated as required by state and federal laws," id. at 1280, the panel characterized as "artificial" their attempt to distinguish their reports as citizen-like speech because they had done to escalate their concerns above their direct supervisor. Id. at 1284.

In reversing the Lane panel decision, the Court held that "the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, ***outside the scope of his ordinary job responsibilities***." 134 S.Ct. at 2378 & n. 4 (emphasis supplied).[5]

The Court in Lane focused on the extraordinary nature of public corruption — quoting the United States' amicus brief about how prosecutions of corruption cases "often depend on evidence about activities that government officials undertook while in office" and therefore "require testimony from other government employees." Id. at 2380. The Court concluded that

> It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials — speech by public employees regarding information learned through their employment — may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

Id.

The Court of Appeals for the Eleventh Circuit has likewise displayed considerable solicitude, pre-Garcetti, towards law enforcement officers engaged in the ferreting out of corruption — even while holding, in an opinion that seemed to presage Garcetti, Morris v. Crow, 142 F.3d 1379 (11th Cir. 1998), that a sheriff's deputy who was simply doing his job could not claim first-amendment

---

[5]The narrowness of the question presented was a function of the petition for certiorari:

> [L]ane asked the Court to decide only whether truthful sworn testimony that is not a part of an employee's ordinary job responsibilities is citizen speech on a matter of public concern. Pet. for Cert. i. We accordingly need not address in this case whether truthful sworn testimony would constitute citizen speech under Garcetti when given as part of a public employee's ordinary job duties, and express no opinion on the matter today.

Id.

7

protection for filling out an accident report and then testifying about it in a civil suit. For example, in Cooper v. Smith, 89 F.3d 761, 765 (11th Cir. 1996) the Court denied qualified immunity to a sheriff who retaliated against deputy who had cooperated in a corruption investigation. In Oladeinde v. Birmingham, 963 F.2d 1481, 1486 (11th Cir. 1992), the court held that two detectives stated a claim when they

> alleged the following: before, during and after their time in the Birmingham Police Department Narcotics Unit, plaintiffs sought to expose allegedly corrupt connections between police, city officials and drug dealers; and, as a result of these efforts, plaintiffs were exposed to retaliatory harassment, threats and transfers to keep them quiet about affairs that might be a matter of public concern.

No published post-Garcetti Eleventh Circuit opinion, meanwhile, holds that external complaints about public corruption would not be protected by the First Amendment.[6]

**Would the defendant's reaction deter protected speech?**

Although the Eleventh Circuit previously "required an employee to establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action,'" Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008), citing Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004), subsequent to the Supreme Court's decision in Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), "in which the Court announced a new rule which redefines the standard for retaliation claims under Title VII," Crawford, 529 F.3d at 973, such that "the type of employer conduct considered actionable has been broadened from that which adversely effects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." 529 F.3d at 973.

**Is there a causal connection?**

"Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision," Mize v. Jefferson City Bd. of Educ.,

---

[6] Battle v. Board of Regents, 468 F.3d 755 (11th Cir. 2006), cited by defendant, DE 86, at 19, involved only internal complaints to the plaintiff's supervisors concerning fraudulent practices that she uncovered as part of her assigned tasks in a the Office of Financial Aid and Veterans Affairs at Fort Valley State University. Vila v. Padron, 484 F.3d 1334(11th Cir. 2007), see DE 86, at 16, similarly involved purely internal complaints about several incidents that came to the attention of an external vice president of Miami-Dade Community College as part of her job, concerning which her only outside communication was a private conversation with a former trustee and fellow lawyer during which she sought "guidance." Id. at 1340

93 F.3d 739, 745 (11th Cir. 1996) (First Amendment), citing <u>Bechtel Constr. Co. v. Secretary of Labor</u>, 50 F.3d 926, 934 (11th Cir.1995) (Energy Reorganization Act's whistle-blower provisions) (inference permissible where employee questioned safety procedures in radiation control area of plant), so long as the proximity is less than three months.  See, e.g., <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007) (Title VII).  Temporal proximity is satisfied if the employer or its agent takes a "first step" in the adverse action within that period.  See, e.g., <u>Hamilton v. Geithner</u>, 666 F.3d 1344 (D.C. Cir. 2012) (Title VII) ("given Hamilton's claim that Burns 'ignored' him in December 2003 when he requested information regarding the detail, ... it appears that Burns actually took a first step toward the adverse action just two months after Hamilton filed his formal complaint"); <u>Heaton v. Weitz Co.</u>, 534 F.3d 882, 888 (8th Cir. 2008)(affirming denial of defendant's Rule 50 motion in case where a reasonable jury could find that there was a pattern of adverse actions against the plaintiff beginning shortly after the time he complained and lasting until he was laid off).

## ARGUMENT

**Point 1: Humberto Valdes is a qualified person with a disability.**

    **Subpoint A: Material factual disputes exist as to what function of Valdes's job are "essential."**

Defendant does not question that Valdes is disabled, only whether he is "qualified" and therefore protected by the ADA and FCRA.  The City focuses its attack on Valdes' qualifications on his alleged inability to "work variable hours and shift schedules as needed.  Motion, page 13 of 23.  However, it is far from undisputed that this ability is "essential" to a lieutenant's job.  First, the "variable hour and shift" requirement was not even included in the job description in Valdes' personnel file and only appeared in documents that surfaced after Valdes requested an ADA accommodation.  Plaintiff's Statement of Disputed Material Facts ("PF"), ¶ 50, Exs. 17 and 18 to Plaintiff's Attachment ("PA") 1.  Moreover, while lawyer/chief, Gomez, testified that the "essential functions" of a lieutenant's job are those that appear in the "knowledge and skills" section, the "variable hours and shift" requirement—when it appears—is set forth in the first section of the description called "Illustrative Tasks" until sometime between 3:47 p.m. and 6:09 p.m. on November 16, 2011 when the section is renamed "Essential Duties and Responsibilities" after a discussion between Aguiles and Gomez about the "minimum requirements of the position."  <u>Id</u>. at PA 11.  Both the police officer and police sergeant job descriptions have the

9

heading "Illustrative Tasks" on the section with the "variable hours and shift" requirement. PF ¶ 49 at PA 1, Exs. 40 and 41. Second, in practice, lieutenants worked pretty regular shifts, with little variability in their shifts and hours. PF ¶ 51 at PA 12 through 16. Lt. Alfaro (PA 12) and Lt. Perez (PA 14) are particularly consistent in their schedules. In this case, exactly what the "employer's judgment" *is* regarding whether "variable shifts and hours" is essential or illustrative is in dispute and the facts presented support an inference that the requirement was added to deny Valdes the accommodation he sought.

Applying the factors enumerated in D'Angelo, supra, likewise compel a conclusion that the "variable hours and shift" requirement is not "essential" under 29 C.F.R. § 1630.2(n)(3). (1) The amount of time spent. The evidence shows that for most Valdes's tenure at the City, he and Lt. Perez covered patrol—Perez responsible for Platoon I working days and Valdes responsible for Platoon II working a flexible afternoon schedule—while Lt. Alfaro generally worked an 8-to-4 schedule in GUI and Lt. Trigo's shift and hours generally coincided with the school day. PF ¶ 51 at PA 1, ¶ 4, 15 and Ex. 1, PA 12-16. Lieutenants generally did not spend must time varying their hours and shifts. (2) Consequences of not performing. The thing that Valdes couldn't do on a regular basis was work "midnights" due to his insomnia. ¶ 50 at PA 1, ¶ 17. He could and did vary his schedule as operational necessity demanded. Id. In any event, the City did not have a dedicated person on "midnights" for years and Dobson, who was assigned to the shift in January 2011 seldom was seen around the station. Id. at PA 1, ¶¶ 4, 15, Ex. 1. 13. 14. (3) Collective Bargaining Agreement. This is not a factor. (4) Work experience of past and current incumbents. Since the same five lieutenants are both "past" and "current" incumbents, this factor is covered by factors (1) and (2).

Likewise, the EEOC's § 1630.2(2)(2) "nonexclusive" bases on which a job function may be deemed essential do not support the City's position that the ability to work "variable hours and shifts" essential. (1) The lieutenant's position does not exist for the purpose of working variable hours and shifts. It exists to supervise "law enforcement work directing a shift of police personnel in the protection of life and property or in specialized staff activities for the City of Doral Police Department." PF ¶ 50 at PA 1, Ex. 17 and 18, PA 11. (2) There are only 5 lieutenants to carry out, and only 4 once Dobson was fired, but at the time Dobson was put on midnights, he did not have responsibility for supervising anyone and often was not there. SF 51 at PA 1, ¶ 15, Exs. 1 and 4. (3) No evidence points to the conclusion that the ability to work

variable hours and shifts is either "highly specialized" or that any of th Doral lieutenants was hired (or promoted) for any special expertise or ability to be "variable.

As the court in <u>Samson</u> noted, quoting <u>Keith</u>, "Whether a job function is essential is a question of fact that typically is not suitable for resolution on a motion for summary judgment."

**<u>Subpoint B</u>: Valdes is capable of performing the essential functions of the his job.**

Despite his occupational injury-induced PTSD, panic disorder, insomnia, need for medication and periodic "tune ups" during stressful times by his therapists, Gomez rated Valdes's performance as a police lieutenant between "above average" and "exceptional" on an evaluation completed on November 15, 2011.  PF ¶ 50 at PA 1, ¶ 16, Ex. 16.  Valdes made more arrests and impounded more property than all the sergeants and lieutenants together.  Defendant's Appendix (DA 16).  He was officer of the year and nominated for prestigious awards.  PF ¶ 53, PA 6, 8 and Ex. 7.  He performed both the administrative and operational tasks associated with his job more than adequately.  PF ¶¶ 49, 54 at PA 1, ¶ 8, PA 10.  Even if the ability to work variable hours and shifts were an essential function, which it is not, Valdes has demonstrated the ability perform the tasks required of him as a lieutenant.

Likewise, Valdes had done and was doing and doing well the other tasks that the City contends are essential functions of the job: (1) road patrol, (2) traffic stops, (3) making arrests, (4) seizing property, (5) testifying in court and (6) acting in emergencies and complex law enforcement situations.  DF ¶ 3.  PF ¶¶ 53, 54 at PA 1, PA 10.  Indeed, he got an official stamp of approval as from Mr. Mangan, who found in January 2012 that he could perform his duties without limitation on a day shift with continued treatment.  PF ¶ 61, PA 1, Ex. 20.  Even after Dr. Mangan found Valdes temporarily unfit for duty in March 2012, PF ¶ 61 at PA 1, ¶ ¶ , 31, Ex. 20—a condition Mangan found "situational and directly related to Valdes's work environment" and not permanently disabling—Dr. Garcia-Granda released Valdes on September 12, 2012 to return to work on a trial basis in a day-time desk job.  PF ¶ 64 at PA 34, Ex. 36.  To the extent that Dr. Garcia Granda opined Valdes' impairment was permanent, Dr. Mangan thought otherwise—a factual dispute precluding summary judgment.

Thus, while the "variable hours and shift" requirement was not an essential function of a lieutenant's job, the other six tasks may well have been and further analysis is required to determine if Valdes could perform them with a reasonable accommodation.

**Subpoint C: Valdes could perform all essential functions of his job with the accommodations of working primarily daytime hours with a flexible schedule.**

The City routinely accommodated light duty requests for police officers with operational injuries both historically and in the fall when Valdes sought to return to work.  PF ¶ 52 at PA 1, ¶ 5, Ex. 42, 43; PA 4, ¶ 7; PA 10.  Gomez always previously accommodated Valdes's need for flexibility and no prolonged night work.  PA 1, ¶ 7, PA 7.  This allowed Valdes not only to perform, but excel.  See Subpoint B, supra,

Plaintiff was a "qualified" individual and is covered by the ADA.

**Point 2: Humberto Valdes makes out a prima facie First Amendment case.**

**Subpoint A:   His speech was protected.**

Humberto Valdes's speech was constitutionally protected.

*First*, it is beyond debate that what he was talking about — such as how forfeited i-Phones, seized watches and high-priced (and high-powered) police weaponry had all gone missing from the City of Doral Police Department, see, e.g., Plaintiff's Facts ("PF"), ¶¶ 58-59 — qualifies as speech about matters of public concern.  See, e.g., Lane, 134 S. Ct. at 2380 ("The content of Lane's testimony — corruption in a public program and misuse of state funds — obviously involves a matter of significant public concern").

*Second*, although Valdes may have learned about Chief Valdes's defalcations while Valdes was on the job — and, frankly, as the United States highlighted in its Lane amicus brief, who is in a better position to learn about crooked public officials than honest public employees working alongside them, see 134 S. Ct. at 2380  — the vehicles by which he disclosed it are hardly within "the scope of the ordinary job responsibilities," id. at 2378 & n. 4, of a suburban police lieutenant whose job duties were supposed to be (according to both Valdez and the City (albeit in different context), largely administrative.  See, e.g., Declaration of Humberto Valdes Made Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746 ("Valdes Dec."), at 1-2, ¶ 3 (Valdes's description of his job), and 22-23, ¶ 32 (Composite Exhibit 35) (City's May 23, 2012 job description).  Rather, Valdes:

• was ordered by Internal Affairs (IA) Sergeant George Gulla and Human Resources (HR) Director Jorleen Aguiles to give Gulla an under-oath account[7] of his observations

---

[7]Even though Valdes may have been testifying in an internal-affairs investigation, he was

(continued...)

12

concerning, inter alia, Chief Gomez's permitting civilians to use automatic weapons at the police firing range, hiring as the IA lieutenant an office with a checkered past on the Miami Police Department, falsifying department records to mask the political firing of personnel who spoke out against him and permitting an apparently favored female police officer to move to the day shift while retaining her night-shift pay differential, PF, ¶ 57; Valdes Dec,, 6-7, ¶ 9;

• responded to a request by a Florida Department of Law Enforcement agent by giving a voluntary sworn statement about how Chief Gomez had hired an officer suspended from the South Miami Police Department for acting as a bodyguard for a known drug dealer, and had apparently misappropriated 14 Apple I-phones, a tracking device and numerous expensive watches (at least one of which was confirmed as stolen) that Valdes had seized, PF  ¶ 57; Valdes Dec. at 7-9, ¶ 10, and

• met with a Miami-Dade Public Corruption Unit sergeant, as well as a prosecutor from the State Attorney's Office — at a time when he was out on leave — concerning, among other things, $80,000 worth of weaponry, including two MP 15 military-grade assault rifles, that had been purchased with City funds, but were nowhere to be found.  PF ¶ 58, Valdes Dec.  at 14, 20-21 and 23-24 ¶¶ 18, 29 and 33.

Further, while Valdes may have asserted in a July 3, 201 2-mail (while he was out on FMLA leave) that his "duties as a law enforcement officer and police manager for the City of Doral, require that I investigate suspected criminal activity and police misconduct by police personnel," Defendant, City of Doral's, Motion for Summary Judgment, DE 86, at 18,  PF ¶ 58 and Valdes Dec., at 24, ¶ 33, the City's response, delivered by an assistant city attorney in a July 5, 2012 e-mail, left little doubt that it was buying any of that:

> ***With respect to your assertion that you are conducting an investigation of alleged misconduct in the City, please be advised that you are not authorized to do so.*** At this time, you are not on active duty with the Police Department based on the recommendation of your treating mental health care provider. ***Consequently, any investigation or fact finding that you wish to do must be conducted as a private citizen****….*

---

[7](...continued)
doing so under penalty of perjury — which oath the Lane  court note creates an "independent obligation [that] renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee."  134 S. Ct. at 2379.

13

PF ¶ 58, Valdes Dec., at 24, ¶ 33, Exhibit 37, Doral_00339.[8]

> **Subpoint B:** **What Gomez and the City did to Valdes 'would likely deter a person of ordinary firmness from engaging in such speech.'**

Gomez, having learned what Valdes had said about him, stripped Valdes of his special assignment of the Crime Prevention Unit ("CPU"), transferred him to what Gomez described as a "forever" assignment to the midnight shift, subjected Valdes to increased scrutiny, told Valdes that Valdes would not be working by January 2012 and sent an e-mail to all lieutenants saying that he planned to promote someone to fill the midnight shift recently vacated by a resignation with a reassignment in two to three weeks." PF, ¶ 70; Valdes Dec., at 10-11, ¶¶ 13-14.

The City administration, meanwhile, ceased requiring Gomez to schedule Valdes to provide the same freedom that Valdes had previously enjoyed for late afternoon and early evening visits to the mental health professionals who were treating him for work-related psychiatric and psychological injuries, and to accommodate his work-related PTSD, insomnia and panic disorder. PF ¶¶ 52, 59, 60; Valdes Dec., at 5, 13-14, ¶¶ 8, 17. When Valdes informed the human resources director in November 2011 that he needed a primarily day-time shift, she not only pressed him for more information from his treating doctors, but changed the job description to add a requirement that lieutenants be able to work "variable hours and shift schedules as needed" and changed the heading of that section of the description from "Illustrative Tasks" to "Essential Duties and Responsibilities." PF ¶ 50 Valdes Dec., at 13-14, ¶ 17.

Aguiles on December 15, 2011 informed Valdes that his doctors' notes certifying him as able to work, but asking for a day-shift accommodation, were insufficient, and ordered him to a fitness- for-duty exam. PF ¶ 61; Valdes Dec., at 15, p. 19. Gomez immediately collected Valdes's badge, guns, credential and keys; ordered Valdez to pack all personal belongings from both his office and his police car and then insisted on driving Valdes home to collect his off-duty weapon. Valdes Dec., at 16, ¶ 20. Following an exam, the City permitted Valdes to return Jan. 9, 2012, but failed to grant the day shift that the examining physician said that Valdes needed. Valdes Dec., at 16, ¶ 21. Additionally, Gomez immediately began an IA investigation concerning Valdes and his fiancé's moving to Broward County, which was sustained PF, ¶ 62; Valdes Dec., at 17, ¶ 22. Although the City conditioned Valdes's return to work on his continuing therapy, it

---

[8]The e-mail was mistakenly cited in Valdes's Declaration as Doral_00349.

forced him to work 2 p.m.-10 p.m. (as opposed to the day-shift that his doctors requested), which made his doctor's 2 p.m.-7 p.m. therapy window inaccessible.  Valdes Dec., at 17-19, ¶ 23-25.  Valdes complained about his treatment Feb. 15; Aguiles relieved him from duty Feb. 16 and sent him for another fitness-for-duty exam, which Valdes initially refused, electing FMLA leave instead.  Valdes Dec., at 20-21, ¶¶ 28-29.

Based on misinformation furnished by the City, the same doctor who earlier found Valdes fit for duty declared him temporarily (but not permanently) unfit following a March 1 exam.  PF, ¶ 61; Valdes Dec., 22, ¶ 31.  When Valdes met with Aguiles to request light duty, he was told that there was no light duty for sergeants or lieutenants.  Valdes Dec. at 22-23, ¶ 32.  Valdes remained on leave.  Valdes Dec., at 23, ¶ 33.  Although a doctor released Valdes for work on a trial basis in September 2012, the City refused to allow him to return, again representing (falsely) that there was no light duty for sergeants or lieutenants and that he could not work a day shift.  Valdes Dec. at 24-26, ¶¶ 34-37.  The City finally offered Valdes a job as a police clerical aide at the lowest end of the pay scale, his attempted acceptance of which the City deemed a refusal and a resignation.  PF ¶ 64; Valdes Dec., at 26-27, ¶ 38.

Thus, Valdes suffered retaliation that not only satisfies the post-<u>White</u> standard articulated in <u>Brannon</u> and <u>Crawford</u>, but would easily meet the prior requirement of <u>Stavropoulos</u>.

**Subpoint C:   There is a causal connection.**

Jorleen Aguiles, the City's Director of Human Resources from 2005 to 2013, and George Gulla, a Police Department Internal Affairs investigator, beginning in March 2011, investigated Police Chief Ricardo Gomez, Lt. James Dobson and Lt. Jose Trigo, and others, following receipt of anonymous letters accusing them of, among other things, favoritism.  DA-1, at 1-3 , ¶¶ 1-12Valdes provided a sworn recorded statement June 6 to the City investigators, <u>id</u>. at 3, ¶ ¶ 12-15; Valdes Dec., at 6, ¶ 9, and later another sworn statement to FDLE in a parallel criminal investigation. Valdes Dec. at 7-9, ¶ 10.

Aguiles told the lead FDLE agent, William Saladrigas, that "a lot of people were either threatening to or actually submitting whistleblower letters right against they gave their statement to for fear hat the chief was going to go after them," including even Gulla, the City's IA investigator, who filed a whistleblower-protectioin document prior to giving a statement to FDLE, PF ¶ 67.

Aguiles also notified Yvonne Soler-McKinley, the City Manager, on June 8, 2011, that Gomez and Trigo were intimidating both prospective witnesses and those who had testified, which was interfering with the IA investigation. PF, ¶ 68. Rather than pass that on to IA to investigate, as required by City policy, however, Soler-McKinley — who has known Gomez since he was in high school and she and his sister were college friends — merely set him an e-mail, suggesting that he stop. PF, at ¶¶ 65, 68.

Pursuant to IA procedures, Dobson and Trigo were given access to all of the statements in the IA investigation — including that of Valdes — prior to their own interviews on, respectively, August 14 and September 8, 2011. PF, ¶ 66. Shortly after Dobson and Trigo, Gomez's fellow subjects of the investigation, were given access to the statements, Gomez, assisted by Aguiles (who had been privy to Valdes's statement since he first made it) launched into the retaliatory behavior that is catalogued more fully in the first three paragraph of Subpoint B.

Soler-McKinley and Gomez got copies of the FDLE report, transcripts, summaries and recordings and read everything, including Valdes' testimony, in the FDLE investigation immediately after FDLE issued its final report in January 2012. PF, ¶ 71. The retaliation resumed — and even intensified — in late February, early March, with the misinformation provided by the City to the doctor doing Valdes's March 1 fitness-for-duty examination. PF ¶ 61; Valdes Dec., 22, ¶ 31.

Therefore, there is *One*, close temporal proximity between the release of Valdes's IA statement to Dobson and Trigo, Gomez's fellow targets of the investigation and Gomez's "forever" banishment of Valdes to the midnight shift; *Two*, an acknowledgment of Gomez's intimidation and threats of retaliation that are so palpable as to cause Aguiles to complain to both FDLE and the City Manager, and to scare even the IA investigator into seeking whistleblower protection; a laissez-faire approach to Gomez's reported attempts at witness tampering by the City Manager, a long time personal acquaintance; and, once the FDLE transcripts are made public and the full measure of Valdes's anti-corruption testimony is made available, a ratchetting up of the retaliation until Valdes, once the commander of CPU, cannot even get a clerical aide's job.

From both the circumstances and the progression, reasonable jurors could find a causal connection between Valdes's protected behavior and his precipitous demise.

## CONCLUSION

Based on the arguments and authorities herein, the City's motion should be denied.

        Respectfully Submitted,

*/s/ Karen Cool,an Amlong*
Karen Coolman Amlong
Florida Bar Number 275565
Kamlong@theamlongfirm.com
William R. Amlong
Florida Bar Number 470228
Wramlong@theamlongfirm.com
AMLONG & AMLONG, P.A.
Attorney for Plaintiff
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by ECF this   4th   day of February, 2015 to Damian H. Albert, Esquire, albert@jambg.com; shore@jambg.com; ericksen@jambg.com; Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A. 2455 East Sunrise Boulevard Suite 1000, Fort Lauderdale, FL  33304..

        /s/ *Karen Coolman Amlong*
        KAREN COOLMAN AMLONG

C:\Users\kamlong\Desktop\Valdes MSJ\Plaintiff's Response to Summary Judgment.wpd