# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 13-CV-24048-HUCK

HUMBERTO VALDES,
      Plaintiff,

 vs.

CITY OF DORAL, et al.
      Defendants.

_____/

## Order Granting Defendant City of Doral's Motion for Summary Judgment

THIS CAUSE is before the Court on Defendant City of Doral's Motion for Summary Judgment, filed January 13, 2015.  [D.E. 86.]  Plaintiff Humberto Valdes alleges the City of Doral ("the City") violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.01 *et seq.*; and 42 U.S.C. § 1983.  For the reasons stated below, the City's Motion is granted and Plaintiff's Complaint is dismissed.

## Background

Plaintiff Humberto Valdes alleges that the City failed to accommodate his disabilities in violation of the ADA and FCRA (Counts III–IV) and violated his First Amendment rights under 42 U.S.C. § 1983 (Count VIII).[1]

---

[1] Valdes consents to summary judgment on Counts I–II (alleging retaliation under Title VII "opposition clause," 42 U.S.C. § 2000e-3(a) and the FCRA, Fla. Stat. § 760.10(7)).  The Court previously dismissed Counts V–VII (alleging retaliation under Title VII "participation clause," 42 U.S.C. § 2000e-3(a), the ADA, 42 U.S.C. § 12203(a) and the FCRA, Fla. Stat. § 760.10) and Counts IX–X (alleging violations of 42 U.S.C. § 1983 against individual defendants.

1

On a motion for summary judgment, the court considers the relevant facts in the light most favorable to the non-movant.  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1249 (11th Cir. 2007).  The record shows that at all relevant times the City employed Jorleen Aguiles as Director of Human Resources, Ricardo Gomez as Chief of Police, and Yvonne Soler-McKinley as City Manager.  In April 2008, the City hired Valdes as a lieutenant in the City Police Department ("Department").  Valdes previously worked for twenty-four years for the City of Hialeah as a police officer, sergeant, lieutenant, and SWAT team commander.  As a lieutenant for the City of Doral, Valdes supervised patrol officers and sergeants, oversaw emergency situations, spearheaded investigations, testified in court, made arrests, and seized property, among other functions.  [D.E. 88-1:1; 88-2:1; 88-3:1; 94-4:7–8; 108-1:1.

The City assigned its lieutenants to one of three eight-hour shifts: the 6 a.m. to 2 p.m. "day shift," the 2 p.m to 10 p.m. "afternoon shift," or the 10 p.m to 6 a.m "midnight shift."  From late 2008 through January 2011, Valdes and Lieutenant Miguel Perez were the only lieutenant platoon commanders in the Department.  They were solely responsible for supervising the City's patrol officers and sergeants, twenty-four hours a day, 365 days a year.  Valdes was responsible for Platoon II, whose officers and sergeants worked from roughly 5 p.m. to 5 a.m.  During this time, Valdes typically worked the afternoon shift and would manage issues that arose overnight when he returned to work the next day, although at times he worked later than midnight.  In January 2011, Valdes took charge of the Crime Prevention Unit ("CPU"), which he commanded until it was disbanded in September 2011.  [D.E. 88-2; 94:4–5; 94-1:6–22; 94-13:2; 108-1; 109-4:3.]

Valdes has been diagnosed with panic disorder, agoraphobia (a type of anxiety disorder), insomnia, and post-traumatic stress disorder ("PTSD"). These conditions stem, at least in part, from two work-related incidents: a March 2009 collision involving his and another police vehicle and a September 2010 incident when a cardiac arrest victim on whom Valdes was performing rescue procedures vomited in Valdes's face and later died. Valdes received worker's compensation for wages and medical expenses related to mental health issues caused or exacerbated by each of these incidents.[2]  [D.E. 88-4:75, 87; 94-4; 94-5; 108-1:3–4, 13; 109-2:8.]

Following the 2009 collision, Dr. Ricardo Sandoval, a psychiatrist, diagnosed Valdes with panic disorder and agoraphobia. Valdes was on paid leave from March 20, 2009 to April 10, 2009. Upon his return to work, Valdes received light-duty assignments for six months. In October 2009, Valdes resumed full-duty work.[3]  [D.E. 108-1:4; 109-2:26–36.]

A year later, in October 2010, Valdes missed seven to ten days of work as a result of the September 2010 incident. In November 2010, Valdes began regular counseling sessions with Dr. Herman Vega, a licensed mental health counselor, as part of his workman's compensation treatment regime. At that time, Valdes requested a work

---

2. The record indicates that Valdes filed for and received worker's compensation benefits related to both incidents under case numbers WC 2009110869 and WC2010116510.  [D.E. 94-4; 94-5; 94-17] (email exchanges among Sandra Vasquez, the City's Worker's Compensation Clerk, Aguiles, Valdes, and others regarding Valdes's worker's compensation claims).

3. The record contains twenty-two form psychiatric progress reports, documenting Valdes's condition, completed by Dr. Sandoval on a weekly or bi-weekly basis from May 5, 2009 to November 12, 2009. These reports contain a "work status" section, where the reporting doctor can recommend "No Work," "Full Time," "Part Time," or "Light Duty." Dr. Sandoval selected "light duty" on six reports: 3 in May, and 1 each in June, July, and August. The remaining sixteen reports recommend "full time" work or make no recommendation.  [D.E. 109-2:7–30.]

3

schedule that would allow him to attend therapy appointments between 2 and 7 p.m. and to spend time with his children.  During that time Valdes regularly left work for therapy sessions that occurred between 2 and 7 p.m.  In January 2011, while he was being treated by Dr. Vega, Valdes was made Commander of the CPU.  [D.E. 88-11:1; 108-1:5–10; 109-6:1–8.]

In March 2011, the City's Human Resources Director, Jorleen Aguiles, received two anonymous letters alleging that three employees of the City Police Department— Chief Ricardo Gomez, Lieutenant Jose Trigo, and Lieutenant James Dobson—had engaged in misconduct.  Aguiles shared these letters with City Manager Yvonne Soler-McKinley, who contacted the Miami-Dade County State Attorney's Office and the Florida Department of Law Enforcement ("FDLE").  The City opened its own Internal Affairs ("IA") investigation into the allegations and FDLE commenced a separate investigation.  These concurrent investigations lasted for several months.  [D.E. 88-1:1–4; 88-3:1–4.]

In April 2011, Lieutenant Trigo reassigned Valdes's then-fiancé, a police officer for the City, from one unit to another unit within the Department.  [D.E. 88-2:8–9.]

In June 2011, investigators for the City and the FDLE requested statements from Valdes for use in their respective investigations.   On June 6, in the presence of Aguiles, Valdes provided a sworn statement to George Gulla, the City's Internal Affairs Sergeant. The next day, Valdes provided a sworn statement to FDLE Agent William Saladrigas. On June 8, upon hearing that Gomez may have been making intimidating comments to potential witnesses in the investigations, Soler-McKinley sent Gomez a text message

instructing him to refrain from making such comments.  [D.E. 88-1:2; 108-1:6–7; 108-9:30–31.]

During the course of the IA and FDLE investigations, a witness had the opportunity to review the statements of other witnesses who had previously testified. Dobson testified in the IA investigation on August 16, 2011, Trigo testified on September 8, 2011, and Gomez testified on February 7, 2012.  The FDLE investigation concluded in December 2011, at which point Gomez made a public-records request for all witness statements given in the course of that investigation.  The IA investigation concluded in October 2011 as to Dobson and Trigo and sometime after February 2012 as to Gomez. [D.E. 88-1:3–4; 88-2:3–4.]

In September 2011, Gomez disbanded the CPU and Valdes then returned to his previous position commanding Platoon II.  Around this time, Valdes became concerned that Gomez was retaliating against him.  [D.E. 88-2; 94:11; 94-9:1; 108-1.]

On November 1, 2011, the City terminated Lieutenant Dobson, creating a vacancy for a lieutenant in the midnight shift.  Gomez initially informed Valdes that he would have to cover the vacant midnight shift.  In response, Valdes first submitted a hardship request, claiming that this schedule would affect his family relations and his general health.  He then submitted a formal request for accommodation under the ADA, claiming that he was unable to work at night due to his panic attacks, PTSD, and sleep disorder. Valdes continued to work the afternoon shift and never worked the midnight shift.  [D.E. 88-1:4–5; 88-2:5; 88-11:1.]

The same day that Dobson was terminated, Valdes sent a memorandum to Aguiles outlining his concerns that Gomez was acting in a retaliatory manner.  Valdes suggested that Gomez was aware of his testimony in the IA investigation because Gomez's demeanor changed toward Valdes after Trigo testified in the IA investigation and had an opportunity to view the statements of others, including Valdes.  Valdes apparently believed that Trigo reported Valdes's statements to Gomez.  Valdes specifically claimed that Gomez retaliated against him by 1) asking Valdes to work the midnight shift, 2) demanding that Valdes explain his failure to sign overtime paperwork for a sergeant under his direct supervision, and 3) commenting on Valdes's fault in a parking lot fender-bender before the official investigation had concluded.  [D.E. 94-12:3–5.]

On or around December 13, 2011, Valdes met with Aguiles to discuss his request for accommodation.  During that meeting, Aguiles became concerned that Valdes was not fit for duty.  After the meeting, she discussed her concerns with Soler-McKinley and the City Attorney, Kara Nickle.  Aguiles then contacted psychologist Dr. Brian Mangan, who agreed to perform a fitness-for-duty evaluation the next week.  Valdes was placed on paid administrative leave pending the outcome of that evaluation.  [D.E. 88-1:8; 108-4:2–3, 5–10.]

The day Valdes was placed on administrative leave, Gomez drove him home.  The City requires that police officers report any change of residence.  Valdes directed Gomez to a different residence than he had last reported to the City.  In the driveway, Gomez observed the City police vehicle assigned to Valdes's then-fiancé, who had also not reported her change of residence to the City.  After observing that Valdes and his fiancé

had violated City policy, Gomez opened an Internal Affairs investigation into the matter. [D.E. 88-2:6–7; 94-23.]

In early January, Dr. Mangan concluded that Valdes was fit for duty. [D.E. 88-1:6–7.] Valdes returned to work on January 9, 2012. Valdes asserts that in the weeks after he returned Gomez and Aguiles regularly denied his requests for leave to see his doctors and implemented strict procedures for leave requests.[4] [D.E. 94:20; 94-30:3–4.]

On January 31, 2012, Valdes requested accommodation to work the 6 a.m. to 2 p.m. day shift, rather than the afternoon shift, so that he could attend regular appointments with his therapist. On February 13, 2012, Valdes sent a letter to Aguiles stating that the City's failure to respond to his accommodation requests dating back to November was retaliatory and was exacerbating his medical condition. On February 15, Aguiles met with Valdes to discuss his pending requests for accommodation. City Human Resources Coordinator, Isabel Gonzalez, also attended this meeting, and, as did Aguiles, took notes of the discussion. In the meeting, Valdes reported to Aguiles that he had been falling asleep while working the afternoon shift and that his panic attacks had increased in frequency. After the meeting, Aguiles informed Soler-McKinley, Nickel and Dr. Mangan of her concerns that Valdes's apparently deteriorating condition may render him unfit for duty. The day after the meeting, Aguiles sent her notes from the meeting to

---

4. Although Valdes asserts that Gomez and Aguiles "regularly" denied his requests to see doctors, Valdes does not identify any instance where he was denied leave in advance of a scheduled appointment. Rather, he refers only to two instances in February 2012 when he notified his superiors, via emails sent the morning of his scheduled shifts, that he would not report for duty due to "health reasons." On the first occasion, Aguiles told Valdes that he must report for duty. In the second instance, Valdes wrote to Gomez, "The delay in resolving my pending [internal affairs investigation] is aggravating my medical condition," and Gomez granted his request for leave. [D.E. 94:20; 94-30:3–4.]

Dr. Mangan.   Valdes claims that the notes contained exaggerated and inaccurate information.   Specifically, Valdes complains that Aguiles wrote that Valdes's panic attacks cause him to be "hypersensitive."   In contrast, the Gonzalez notes do not specifically contain this term.   While Valdes contests Aguiles's use of the term "hypersensitive," he does not dispute the contents of Gonzales's notes.   Those notes memorialized Valdes's statements that he suffers from PTSD, addiction to prescription sleep aids, and three to five panic attacks per week, which, at various times, have caused him to stay home from work, to be confined to his desk at work, to pull his vehicle to the side of the road for up to 45 minutes while on duty, and to visit a fire station while on duty to have his blood pressure checked.  [D.E. 88-1:8; 94:20; 97:4–9; 105-5:18.]

On February 15, 2012, Valdes was again placed on paid administrative leave pending the outcome of a second fitness-for-duty evaluation conducted by Dr. Mangan. During that March 1 evaluation, Valdes explained his concern that Aguiles may have miscommunicated to Mangan the nature or extent of Valdes's condition.   Nevertheless, as a result of his evaluation, Dr. Mangan determined that Valdes was temporarily unfit for duty.  [D.E. 88-1:8; 94:22–24.]

After Dr. Mangan's second evaluation, Valdes remained on paid leave.[5]  While on leave, Valdes kept regular appointments with his treating psychiatrist, Dr. Bernardo Garcia-Granda, who prescribed medication and provided psychotherapy to Valdes for his

---

5. Pursuant to City policy, Valdes was required to utilize his accrued sick time, vacation time, and paid time off while on leave.  Valdes's position was protected by the Family Medical Leave Act ("FMLA") for the first twelve weeks of leave.  The record does not indicate whether the City continued to pay Valdes after the FMLA period had expired, but the City did employ Valdes for the entirety of his leave.  [D.E. 88-1:8–9; 88-4:26.]

work-related mental health injuries.  From March through July of 2012, Valdes submitted numerous public records requests for documents, audio files and video files related to incidents of alleged misconduct by Gomez and other City officials.  In June 2012, Valdes submitted a written complaint to the Miami-Dade County State Attorney's Office regarding allegations of corruption in the City's Police Department.  Valdes also met with representatives of the Miami-Dade County Public Corruption Unit and the State Attorney's Office.  In July 2012, Valdes sent an email to Soler-McKinley stating, "My duties as a law enforcement officer . . . require that I investigate suspected criminal activity and misconduct by police personnel" and "I will be bringing misconduct allegations against the Chief of Police and other officers within the City of Doral."  An attorney for the City responded to that email, acknowledging Valdes's various records requests, and stating that because Valdes was "not on active duty with the Police Department . . . any investigation or fact finding that you wish to do must be conducted as a private citizen."  [D.E. 88-14:1; 88-5:3; 94:22–24; 94-37:8–9.]

In September 2012, Dr. Garcia-Granda concluded that Valdes was capable of returning to work on a "trial" basis, on the condition that he (1) could only work the day shift, and (2) could not be placed under stress, which meant he could not: (a) perform road patrol, (b) execute traffic stops, (c) make arrests, (d) testify in court, (e) determine the course of action to be taken during emergencies or complex law enforcement situations, or (f) work variable hours or variable shift schedules.  In short, Valdes could perform daytime, stress-free work in an office, but could not fulfill the usual duties of a police lieutenant.  [D.E. 88-5:3–7.]

On October 5, 2012, Aguiles sent a letter to Valdes outlining the nature of his disabilities, his accommodation requests, and the City's responses over the previous eleven months.  At the conclusion of this letter, in a section titled "The City's Proposed Reasonable Accommodation," Aguiles offered Valdes the position of Police Clerical Aide for $23,500, less than one-third of his lieutenant salary. [6]  [D.E. 88-32:1–6.]

On the day his response to the City's proposed accommodation was due, Valdes emailed Aguiles and Soler-McKinley, stating that the clerical aide position amounted to discrimination and harassment, but that he would accept "any other available position." Soler-McKinley responded:

> I have approved a final extension of time until Monday, October 15, 2012, at 12:00 noon, for you to advise the City whether or not you will accept the Police Clerical Aide position.  This is the only available position in the Police Department that matches the work restrictions imposed by your health care provider.  If you do not accept this position by the above deadline, I will consider you as having voluntarily resigned from your employment with the City.

[D.E. 88-1:15–16.]

On the morning of October 15, at 8:41 a.m., Valdes emailed the City Attorney for Doral, Jimmy Morales, stating that he had retained legal counsel and that the accommodations proposed by Aguiles and Soler-McKinley amounted to discrimination and retaliation.  [D.E. 94-48:1–2.]  Morales responded that because Valdes was

---

6. This letter states, in part:

> Given that the City cannot approve your specific accommodation requests, we would like to offer you an alternative accommodation that would enable you to return to work within your restrictions. . . . The position appears to be a perfect match for the work restrictions imposed by Dr. Garcia-Granda, as it is a desk job performing office work with a Monday-Friday 8:00 a.m. to 4:00 p.m. schedule, and it is a low stress position based on the job duties.

[D.E. 88-32:1–6.]

represented by counsel, "[i]t would be totally inappropriate for me to communicate with you at this point," adding, "[p]lease feel free to have your attorney contact me."  [D.E. 94-48:1.]   At 9:57 a.m., Valdes emailed Aguiles and Soler-McKinley: "I have been contacted by the City of Doral attorney Mr. Morales.  He has indicated that he wants my attorney to call him therefor [*sic*], I will not be complying with your demotion request that was due by 12noon today."  [D.E. 88-1:17.]  After the noon deadline passed, Soler-McKinley wrote to Valdes, "you have not accepted the City's transfer offer to a position within your restrictions, [therefore] I have no choice but to consider you as having voluntarily resigned from your employment with the City as of today."  [D.E. 94-49:1–2.] Valdes did not respond until after 6 p.m., when he sent an admittedly ambiguous email summarizing his previous communications, referring to the clerical position proposal as "discriminatory and retaliatory," yet concluding, "Please tell me when and where to report for my new job as a Police Clerical Aide . . ."  [D.E. 94-49:5.]  On November 6, Valdes explained to Dr. Garcia-Granda that his employment with the City ended because "he was offered a desk job but it was basically a demotion because he would have to take a pay cut.  He did not agree with that and he was fired."  [D.E. 88-5:7–8.]

## Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of identifying the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986)).   "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).   "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

### ADA Failure to Accommodate

Title I of the ADA provides that no employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).[7]  A plaintiff makes out a prima facie case of discrimination under this section of the ADA when he shows that (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Samson v. Federal Exp. Corp.*, 746 F.3d 1196, 1200 (11th Cir. 2014) (citation omitted).  The City challenges only the second and third elements.  With regard to the second element, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The "essential functions" of a job are "the fundamental job duties of the employment position" and "do not include the marginal functions of the position."  29

---

7. "Disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir.2005)).  Therefore, both claims are reviewed together here.

C.F.R. § 1630.2(n)(1).  For the reasons discussed below, the Court finds that Valdes is not a qualified individual and therefore must grant Defendant's motion as to Valdes's ADA claims.

The City contends that Valdes is not a qualified individual because he could not perform the essential functions of his job.  See *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir.2005) ("If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA.").  Valdes contends that the record presents a genuine issue of material fact as to the essential functions of a City police lieutenant.  The City argues that each of the following is a function essential to the role of lieutenant: a) making arrests, b) seizing property, c) testifying in court, d) performing road patrol and executing traffic stops, e) determining the course of action to be taken during emergencies or complex law enforcement situations, f) engaging in activities that may cause stress, or g) working outside of daytime hours.

As discussed above, in September 2012, Valdes's treating physician Dr. Garcia-Granda found that Valdes could return to work on a trial basis, but subject to the conditions that Valdes work only in an office, work only during daytime hours, and avoid stressful situations.  [D.E. 88-5:2–3.]  Due to the nature of these limitations, even if the City provided accommodations, Valdes could not make arrests, seize property, testify in court, perform road patrol, execute traffic stops, determine the course of action to be taken during emergencies or complex law enforcement situations, engage in activities that may cause stress, or work outside of daytime hours.  [D.E. 88-5:3–6.]  Valdes does

not contest his inability to perform these law enforcement functions, but argues that there are material issues of fact as to whether they are essential functions of the City lieutenant position.

The "essential functions" of a job are "the fundamental job duties of the employment position" and "do not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  "Whether a particular job function is essential is 'evaluated on a case-by-case basis by examining a number of factors.'"  *Samson*, 746 F.3d at 1200–01 (quoting *D'Angelo*, 422 F.3d at 1230 (internal quotation marks and citation omitted)).  A job function may be essential, among other reasons, because (1) the position exists to perform that function, (2) there are a limited number of employees among whom the function is distributed, or (3) the function is highly specialized so that the employee was hired for his ability to perform the function.  29 C.F.R. § 1630.2(n)(2)(i)–(iii).  Evidence as to whether a function is essential includes (i) "[t]he employer's judgment as to which functions are essential"; (ii) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (iii) "[t]he amount of time spent on the job performing the function"; (iv) "[t]he consequences of not requiring the incumbent to perform the function"; (v) "[t]he terms of a collective bargaining agreement"; (vi) "[t]he work experience of past incumbents in the job"; and (vii) "[t]he current work experience of incumbents in similar jobs."  *Id.* § 1630.2(n)(3)(i)–(vii).  When the relevant statutory

factors are applied to the facts of this case,[8] the Court finds that several of the functions Valdes admittedly could not perform are essential functions of the lieutenant position.

The factors set out in §§ 1630.2(n)(2) and 1630.2(n)(3) are analyzed in tandem. See *Samson*, 746 F.3d at 1201.  As for the relevant factors enumerated in § 1630.2(n)(3), first, the City's judgment is that the ability to make arrests, seize property, testify in court, perform road patrol, execute traffic stops, determine the course of action to be taken during emergencies or complex law enforcement situations, engage in activities that may cause stress, and work flexible hours are essential elements of the job of lieutenant. Second, the City's written job description for the lieutenant position suggests that these functions are essential.[9]  It lists the following skills required of a lieutenant: "[a]bility to react promptly and correctly in emergency or complex law enforcement situations," "[a]bility to obtain information through . . . interrogation," "[s]kill in the care and use of firearms," and "[p]hysical strength and agility sufficient to perform assigned duties."  127: 3.  The job description also summarizes the "[n]ature of [w]ork" of a lieutenant:

> Responsibilities include . . . testifying in court, making arrests, and performing other duties to assist in the administration and operation of the department.  Incumbents are . . . responsible for demonstrating specialized police techniques in the area of assignment.  Work involves an element of personal danger and employees must be able to exercise considerable independent judgment and professional knowledge in making decisions regarding the use of deadly force in protecting citizens and themselves without the benefit of immediate supervisory assistance or advice.

---

8. Not all factors have bearing on this case.  There is no record of a collective bargaining agreement and the parties do not contend that the job of lieutenant is highly specialized.  The other factors apply to varying extents.

9. Valdes argues that the ability to work variable hours was not historically required by the City and was added to the lieutenant's job description to retaliate against him.  The record does not show when the lieutenant job description was changed.  Here, the Court relies on the lieutenant's job description that all parties agree was in place when Valdes was hired.  [See D.E. 127.]

[D.E. 127:3.]  Third, to the extent that the record indicates the relative time Valdes spent on various tasks, that he "seized more money, arrested more people . . . and impounded more cars" than the City's other "sergeants and lieutenants combined" suggests that the ability to make arrests, seize property, determine the course of action to be taken during emergency law enforcement situations, and engage in stress-inducing activities are essential functions of the lieutenant job.  [D.E. 88-4:14.]  Fourth, the burden on the City that would result from not requiring a lieutenant to perform the above-listed functions supports a finding that the functions are essential.  After Dobson was terminated in November 2011, Valdes and Perez were the only lieutenants assigned to oversee all three shifts commanding the City's patrol officers and sergeants.  If Valdes could not leave the office or participate in stress-inducing activities or respond to emergencies, the City would likely either have to hire another lieutenant to work at the same time as Valdes or shift an undue burden on the City's only other lieutenant, causing further demands on the already depleted lieutenant ranks.  Reviewing the sixth and seventh factors together, the experiences of former and current lieutenants as shown throughout the record leads the Court to conclude that each function at issue is an essential function of the lieutenant job. Valdes's past provides the strongest evidence for this conclusion.  During his tenure as lieutenant, the record shows that Valdes performed every task the City contends is essential.  Valdes made arrests, patrolled, seized property, responded to emergencies, and

testified in court.[10]  [D.E. 88-4:11–13; 94:7–8.]  His presence and participation were required during stressful emergency situations including active burglaries, narcotics investigations, and hostage-takings.  [D.E. 88-4:11-12, 15; 94:7–8.]  In addition, he worked variable and late-night hours, staying as late at 2 a.m. and adjusting his schedule as needed.  [D.E. 88-4:9–12.]  Lieutenants Dobson and Trigo also performed road patrol, executed traffic stops, testified in court, determined the course of action to be taken in emergencies, and worked a flexible and variable shift schedule as lieutenants for the City. [D.E. 88-8; 88-9.]

As for the relevant factors enumerated in § 1630.2(n)(2), first, while the lieutenant position is not the type of job defined by a singular function it "exists to perform," several functions fit this bill.  In the broadest sense, a lieutenant exists to command a platoon of sergeants and officers as they respond to a variety of law enforcement situations.  Thus, in the very least, the role of lieutenant exists to make decisions regarding complex law enforcement situations, to perform under stress, and to work away from a desk when needed.  Second, there was "a limited number of employees among whom the function [was] distributed."  The record shows that the City generally employed three lieutenants, and that only one lieutenant is on duty at any given hour of the day.  In essence, when a lieutenant is on duty, he is responsible for all functions of the lieutenant position.  Taken together, these statutory factors support a finding, and the

---

[10] In his affidavit, his defense deposition, and his own pleadings in this case, Valdes promotes the fact that he was named Officer of the Year and nominated for a prestigious law enforcement award based on his job performance in 2009, a year where he made more than 50 arrests and seized over $100,000 in cash.  [D.E. 88-7:62; 88-16:6–7; 94:6.]

Court so finds, as a matter of law, that the functions at issue are essential to the role of a police lieutenant.

*Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522 (1997) supports the Court's finding. The plaintiff in *Holbrook* was a visually impaired police detective. *Id.* at 1526. For years after the accident that impaired his vision, the City of Alpharetta accommodated Holbrook by assigning functions that Holbrook could not complete, such as evidence collection, to other detectives. *Id.* at 1528. The Court held that the collection of evidence is an essential function of a police detective; therefore Holbrook was not a "qualified individual" under the ADA. *Id.* The Court's decision hinged in large part on the unpredictable nature of police work. *Id.* ("[T]he police department cannot predict in advance what crimes will be committed in any given week or what evidence will appear at any given crime scene; indeed, being prepared to respond to unexpected events is, in part, precisely what defines a police officer or detective.").

The unpredictable and stressful situations with which Valdes admittedly dealt as a lieutenant, which include making numerous arrests, responding to gun violence, and performing emergency resuscitation on a heart attack victim, are the precise kinds of emergency circumstances inherent to police work. The ability to respond to stressful situations is even more critical for a lieutenant, the sole supervisor of a team of patrol officers and sergeants, than for a police officer, who is likely one of multiple officers on duty at a given time. The *Holbrook* Court also emphasized that the ADA analysis is not altered by a defendant's "previous accommodation" when it "may have exceeded that which the law requires." *Holbrook*, 112 F.3d at 1528. Thus, the extent that the City

18

accommodated Valdes in the past, or made it easier than is required by law for him to request accommodations, has no bearing on its obligation to Valdes under the ADA.

The Court also finds that there is no question of fact that the ability to work variable hours is an essential function of the job of lieutenant.  This leadership role inherently requires such flexibility to account for possible absences of other lieutenants, as well as the unforeseen emergency circumstances that are inherent to police work. Further, even assuming that there is a factual dispute as to whether the ability to work variable hours is an essential function of a lieutenant's position, the other functions that Valdes could not perform as of September 2012—making arrests, testifying in court, investigating crime scenes, determining the course of action in emergency situations, and all other stress-inducing activities—are certainly essential functions of the job.  Because Valdes could not perform these functions, even with the accommodations he requested, Valdes is not a "qualified individual" under the ADA.  The court therefore grants summary judgment as to Valdes's ADA and FCRA claims.

### § 1983 First Amendment Claim

Valdes asserts that the City violated his First Amendment right to free speech by retaliating against him for making sworn statements to investigators and for his public-records requests.  A First Amendment retaliation claim by a government employee against his or her employer requires balancing "the interests of the . . . citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968).  Accordingly, Valdes's First

Amendment claim is governed by a four-prong analysis.  See *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989); *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007).

The first two prongs, constituting a balancing test, "determine[] whether Plaintiff's speech is protected by the First Amendment," and are decided by a court as a matter of law.  *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006).  First, the court considers whether Plaintiff's speech "may be fairly characterized as constituting speech on a matter of public concern."  *Bryson*, 888 F.2d at 1565 (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (citation and internal quotation marks omitted).  If the first prong is satisfied, then the court will also "weigh[] the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* (quoting *Pickering*, 391 U.S. at 568) (citation and internal quotation marks omitted).

The third and fourth prongs, though generally questions of fact for a jury, may be resolved by the court if there is no genuine issue of material fact.  Third, "[i]f the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee."  *Id.* at 1565–66 (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)); *Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1170 (11th Cir. 2013) (applying *Bryson* to a municipality's decision to conduct an internal affairs investigation against plaintiff).  Fourth, "if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment

decision, the state must prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* (quoting *Mt. Healthy*, 429 U.S. at 286).

Valdes claims that the City retaliated against him based on his sworn statements in the IA and FDLE investigations, statements to Miami-Dade County and the State Attorney's Office, and statements accompanying his public records requests. The City argues that Valdes lacks a valid First Amendment retaliation claim under 42 U.S.C. § 1983 because he was not engaged in protected speech, and even if he was, the record does not support a finding of an adverse action or causation. For the reasons discussed below, the Court finds that even though Valdes engaged in protected speech, the City is entitled to judgment as a matter of law on the First Amendment claim.

<u>Valdes spoke as a citizen on a matter of public concern</u>

The City argues that Valdes did not engage in speech subject to constitutional protection. Valdes contends that his statements were made as a citizen and are thus subject to the full scope of the First Amendment. The statements that form the basis of Valdes's claim are his (1) sworn statement to City officials (Aguiles and Gulla) on June 6, 2011, for use in an ongoing IA investigation; (2) sworn statement to FDLE agent William Saladrigas on June 7, 2011, for use in an ongoing FDLE investigation; (3) public records requests from June and July 2012 for documents, audio files, and video files related to suspected misconduct in the Police Department; and (4) written statements to the Miami-Dade Public Corruption Unit and State Attorney's office in June 2012, requesting a

formal investigation into alleged corruption by Gomez and other City officials.   These statements are constitutionally protected.

"Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment."  *Lane v. Frank*, 134 S. Ct. 2369, 2378 (2014) (finding grand jury testimony by a state employee regarding information learned from an audit conducted in the course of employment was speech subject to First Amendment protection).  The *Lane* Court emphasized the importance of protecting employee speech that reveals corruption by other public officials witnessed during the course of employment.  *Id.* at 2380.  *Lane* limits the holding in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), where the Court found that the contents of a district attorney's internal memorandum to his supervisors was not citizen speech because the memorandum was written as part of the employer's official responsibilities.

The City contends that Valdes did not speak as a citizen when he provided sworn statements to investigators on June 6 and 7, 2011.  The City contends that Valdes spoke as an employee because testifying in court and providing information to government agencies are functions listed in the lieutenant job description.  However, in *Garcetti*, the Supreme Court concluded that an employee may speak as a citizen even when he acts within the bounds of a job description.  547 U.S. at 424–25 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First

22

Amendment purposes.").   Here, the fact that a police lieutenant is expected to testify in court and participate in investigations related to his normal police work does not strip his sworn statements regarding public corruption of First Amendment protection.   To do so "would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs." *Lane*, 134 S. Ct. at 2380.  Viewing all evidence in the light most favorable to Valdes, the court finds that Valdes spoke as a citizen in his June 2011 sworn statements; accordingly those statement are protected by the First Amendment.

The City argues that Valdes's June and July 2012 public records requests for documents, audio files, and video files related to suspected misconduct in the Police Department and that his June 2012 statements to the Miami-Dade Public Corruption Unit and State Attorney's Office do not constitute First Amendment speech.  In a July 2012 letter to Aguiles and other City employees, Valdes wrote that as a law enforcement officer he was obligated to investigate suspected wrongdoing by City officials.  The City responded that Valdes acted as a private citizen because he was not on active duty.  Ironically, now the parties have reversed their respective earlier positions to fit their legal arguments here.  Valdes asserts that he acted as an independent citizen when he requested public records from the City and reported alleged corruption within the City to law enforcement agencies.   Conversely, the City contends that Valdes undertook his investigation as a City lieutenant.

In June 2012, when Valdes made his public records requests and spoke to law enforcement agencies, he had been on leave for months.  There is no evidence in the

record that Valdes was asked to fulfill any duties for his law enforcement job during this time.   Rather, the record shows that Valdes was prohibited from acting as a law enforcement officer until his treating physician approved his return to work.  Viewing all the record evidence in the light most favorable to Valdes, the court finds that Valdes spoke as a citizen in his June and July 2012 public records requests and statements to the Miami-Dade Public Corruption Unit and State Attorney's Office.   Accordingly, that speech is within the ambit of the First Amendment.

To determine "'whether an employee's speech addresses a matter of public concern,' the Court must examine 'the content, form, and context' of the speech, 'as revealed by the whole record.'"  *Carter*, 731 F.3d at 1168 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).   The content of Valdes's testimony and records requests involved alleged corruption and misconduct by government officials.   The form and context of the speech—sworn statements regarding police misconduct and public records requests for evidence of the same—strongly suggest that Valdes's speech was aimed at disclosing, investigating, or helping to end potential corruption.  This speech falls in the category of speech about public corruption that involves a matter of public concern.  See *Lane*, 134 S.Ct. at 2380 ("[C]orruption in a public program and misuse of state funds [ ] obviously involves a matter of significant public concern.").   Therefore, the Court finds that Valdes spoke as a citizen, rather than a City employee, on a matter of public concern.

<u>Valdes's First Amendment interests outweigh state interests</u>

Next, the Court addresses the second prong.  The City does not contend, nor does the record support, a finding that Valdes's speech threatened any interest of the state.

Indeed, the City argues that its actions with regard to Valdes's employment are entirely unrelated to his speech.  Because Valdes's speech is subject to First Amendment protection, and the City has not pointed to any way that speech threatened its interests, Valdes has met the second prong of the First Amendment analysis.  See *Carter*, 731 F.3d at 1170) (police officer who was terminated based on his First Amendment speech met second prong when defendant did not cite evidence showing that the speech "threatened the municipality's ability to maintain the orderly administration of public services").  Based on the absence of record evidence showing otherwise, the Court finds that Valdes's First Amendment interest outweigh any interests of the City.

<u>Valdes's speech did not play a substantial part in the City's decisions</u>

Third, the City contends that even if Valdes's speech is protected by the First Amendment, the record does not support a finding of adverse employment action or causation.  Although adverse action and causation are not specified elements of the First Amendment retaliation analysis for claims of a government employee against his or her employer, the Court reads the City's arguments as attacking the third prong of that analysis.[11]  Summary judgment is proper on that element if there no genuine issue of material fact showing that Valdes's speech played a substantial role in any of the City's allegedly retaliatory decisions.  For the reasons discussed below, the Court finds that the record demonstrates the absence of any material issue of fact that Valdes's speech did not play a substantial role in the City's actions.

---

11. This is consistent with the Court's analysis in its Order Granting in Part Defendant's Motion to Dismiss.  [D.E. 29:19.]

Valdes claims that Aguiles, Gomez, and Soler-McKinley, as agents of the City, retaliated against him from September 2011 through October 2012 for his speech to investigators and his public-records requests. The City responds that Valdes's speech did not play a substantial role in any of the allegedly retaliatory acts.

Valdes contends that Gomez retaliated because of Valdes's June 6, 2011 sworn statement in the City's IA investigation and June 7, 2011 statement to Saladrigas in the FDLE investigation. However, the record shows that Gomez did not know of Valdes's statements to investigators until December 2011 at the earliest.[12] Nonetheless, Valdes contends that Gomez retaliated (1) in September 2011, by terminating the CPU; (2) in October 2011, by becoming increasingly vigilant of Valdes's actions; (3) in November 2011, by threatening to transfer Valdes to the midnight shift, a transfer approved by Soler-McKinley but which never in fact occurred; (4) in December 2011, by opening an internal affairs investigation into Valdes's failure to report that he moved residences;

---

12. Gomez testified that he first saw Valdes's June 2011 statements to FDLE investigators in December 2011, after the FDLE investigation concluded and Gomez submitted a public records request for witness interview summaries. [D.E. 88-2:4.] That testimony is not directly rebutted. Nevertheless, Valdes concludes that Gomez knew of the content of his statements prior to December 2011, based on the fact that Dobson and Trigo were given access to the witness statements during their August and September 2011 interviews. The only record evidence Valdes relies on, however, is inadmissible speculation, double-hearsay and is taken out of context. See *United States v. Robinson*, 239 F. App'x 507, 508 (11th Cir. 2007) (citing Fed. R. Evid. 801(c), 805) ("Hearsay is a 'statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Hearsay within hearsay, or so-called 'double-hearsay,' is admissible only if each part of the combined statements conforms with an exception to the hearsay rule."). The speculative double-hearsay is in a deposition statement by FDLE investigator William Saladrigas, wherein he states "I spoke to people during the course of my investigation who had conversations with Ricardo Gomez where he made comments that one could infer that either he was getting information somewhere or was just drawing opinions based on what was going on under him in his department." [D.E. 88-7:13.] Saladrigas added that Aguiles, and possibly Gulla, told him that "a lot of people were either threatening to or actually submitting whistleblower letters right after they gave their statements to FDLE for fear that the chief was going to go after them." [D.E. 88-7:13–14.] After making this statement, upon which Valdes erroneously relies, Saladrigas was asked whether he recalls having learned that Gomez was aware of the substance of the statements given in the FDLE investigation. Saladrigas responded, "I doubt seriously he was aware of the substance of what was going on, simply because, to be honest with you, none of the people we were talking to . . . were very friendly with him. They wouldn't have gone and done him that favor." [D.E. 88-7:14.]

26

(5) in January 2012, by implementing a more stringent procedure to request time off; and (6) in April 2012, by transferring Valdes's then-fiancé, a City police officer, to a different unit within the Department.  The Court need not address the first three alleged instances of retaliation because the record evidence establishes that they occurred before Gomez knew of Valdes's speech.  See *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 358 (11th Cir. 2005) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.").

As to Gomez's fourth allegedly retaliatory action, the record shows that Valdes unquestionably violated a policy of his employment and Gomez witnessed this violation firsthand, which led to an internal investigation which found that Valdes violated established City policy.  Conversely, the record contains no evidence affirmatively linking Valdes's statements to the internal investigation.  Even so, Valdes invites the Court to infer that an investigation by his boss into his uncontested violation of an employment rule is retaliation for his statements made six months earlier.  The Court declines this invitation.  See *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (finding absent other evidence to show causation, "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough").

As to Gomez's fifth allegedly retaliatory action, the record establishes that the more stringent leave policy was implemented by the entire Department, not just by Gomez, and the record does not show that the policy targeted Valdes in particular.

As to Gomez's sixth allegedly retaliatory action, the record establishes that in April 2012, Gomez reassigned Valdes's then-fiancé, who was an officer for the City during the relevant time period, from the Neighborhood Resource Unit to Platoon I.  The record also shows, and Valdes does not contest, that this transfer occurred after Mrs. Valdes's refusal to give a crime prevention presentation at a local college, which was part of her job as a Neighborhood Resource officer.  The record does not establish that this transfer caused any change to Mrs. Valdes's rank or salary, nor does it establish that Valdes's sworn statements ten months prior to the April 2012 transfer motivated Gomez's action.  In sum, viewing all the evidence in the light most favorable to Valdes, no reasonable juror could find that his sworn statements played any relevant part—let alone a substantial role—in Gomez's allegedly retaliatory actions.  See *Carter*, 731 F.3d at 1170.

Valdes next contends that Aguiles retaliated in response to his June 6, 2011 sworn statement in the IA investigation by (1) requiring that Valdes submit to two fitness-for-duty exams, in December 2011 and in February 2012 and (2) mischaracterizing Valdes's mental state to Dr. Mangan in February 2012.  Valdes further contends that Aguiles and Soler-McKinley retaliated in response to his June and July 2012 record requests and statements to Miami-Dade County authorities and the State Attorney's Office by (3) telling Valdes there was no light duty position for a lieutenant in September 2012, (4) offering Valdes only a clerical position for a salary significantly lower than a lieutenant's salary, and (5) refusing to acknowledge Valdes's alleged acceptance of the clerical job, resulting in the termination of his employment with the City.

As to the first two alleged instances of retaliation by Aguiles, the record does not contain evidence upon which any person could reasonably rely to find that Valdes's speech to the IA investigator—to which Aguiles was a witness—motivated Aguiles's actions regarding Valdes's fitness-for-duty six to seven months later.  See *Thomas*, 506 F.3d at 1364.  To the contrary, the record clearly establishes that Aguiles acted pursuant to her role as HR director by responding to Valdes's claim of disability and multiple requests for accommodation.  The record does not support Valdes's third claim, that retaliatory animus caused Aguiles to deny Valdes's return to work in a light duty position before she offered him the clerical aid position.  Rather, the record shows that Aguiles could not assign Valdes any position until Dr. Garcia-Granda approved of his return to work.  After Dr. Garcia-Granda gave his approval, the City offered Valdes the only available position that would accommodate his disabilities, and he refused to accept it.  Even if the City could have provided Valdes with light duty work that was more desirable to him, which the law does not require, but which Valdes argues it has done for lieutenants recovering from physical injuries in the past, Valdes cites to no evidence that could lead a reasonable fact-finder to conclude that the City denied him light duty work as retaliation for his First Amendment speech, nor does Valdes even attempt to show that any other lieutenant's disability was remotely analogous to his own admittedly debilitating impairments.  Finally, the record does not support a finding that Aguiles and Soler-McKinley offered Valdes the clerical aid job and then terminated his employment as retaliation for his speech.  Rather, the record shows that Valdes could not perform the functions of a lieutenant and that he rejected the City's offer of a clerical position.  In

29

sum, viewing all the record evidence in the light most favorable to Valdes, no reasonable juror could find that Valdes's protected speech played a substantial role in the allegedly retaliatory actions of Aguiles and Soler-McKinley.   See *Carter*, 731 F.3d at 1170. Because Valdes fails the third prong, the Court declines to address whether the City would have reached the same decision absent Valdes's protected speech.   The Court therefore grants summary judgment in favor of the City as to Valdes's § 1983 claim.

### Conclusion

For the foregoing reasons, Defendant City of Doral's Motion for Summary Judgment [D.E. 86] is GRANTED on all remaining claims.  A final judgment in favor of all defendants will be entered by the Court.

DONE AND ORDERED in Chambers, Miami, Florida, on April 30, 2015.

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record

30